# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**MICHELLE C. TERRY,**

     **Plaintiff,**

**v.**                              **Case No.  8:09-cv-1756-T-30TBM**

**REAL TALENT, INC.,**

     **Defendant.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 19), Plaintiff's Response in Opposition (Dkt. 32), Defendant's Motion to Strike (Dkt. 35), and Plaintiff's Response in Opposition to Defendant's Motion to Strike (Dkt. 38).  The Court, having reviewed the motions, responses, record evidence, and being otherwise advised in the premises, concludes that the motions should be denied.

## RELEVANT BACKGROUND[1]

Defendant Real Talent, Inc. ("Defendant") is comprised of a restaurant called The Palms Lounge, a billiard hall called Peabody's Billiards, and a package store called The Falls Liquor Store.  Each of these establishments is located in the same strip mall in Tampa, Florida.  Bryan Peabody ("Peabody") is Defendant's President.

---

[1] This background includes disputed facts, which will be discussed in more detail during the Court's discussion of Defendant's motions.

Plaintiff Michelle C. Terry ("Plaintiff"), who is Peabody's half sister, began working for Defendant as a hostess and bartender in 2001.  Shortly thereafter, she quit her job; however, Plaintiff returned to work for Defendant as a bookkeeper in 2002.  Plaintiff did not have a financial background or previous financial experience.  Beverly Wilson ("Wilson") worked for Defendant as an accountant.  Wilson had financial experience and helped Plaintiff become more organized.

Throughout her employment, Plaintiff received increases in her salary and, in February 2007, her title changed to comptroller, although, according to Plaintiff, the title of "comptroller" was thrown out jokingly, and she was still a bookkeeper "as far as [she] knew."  (Plaintiff's deposition at 17:22-25).  Wilson worked for Defendant until October, 2007.  Plaintiff's responsibilities included balancing the bank accounts, inputting transactions into Quick Books, reconciling credit card deposits and fees, paying vendors, paying taxes (as long as there was enough money in the bank for her to pay them), maintaining and updating employee personnel files, processing weekly payroll, processing employee benefits, and handling human resource questions.  Plaintiff also filled in for other employees when they did not report to work.

According to Plaintiff, some of her responsibilities were reviewed by Peabody and other management.  For example, sometimes Peabody or other managers would check with Plaintiff regarding whether there was enough money in the business for her to pay certain expenses.  According to Plaintiff, she and Peabody met weekly or monthly about the business and she was required to get approval from Peabody for large payments, such as the sales and

use tax and payroll.  Peabody instructed Plaintiff when to pay payroll and when to make the sales and use tax payment.  According to Plaintiff, she was not responsible for the financial stability of the company.

Plaintiff testified during her deposition that Peabody was not always truthful and had lied on documents.  Plaintiff also stated in her affidavit that in 2006, 2007, and 2008, Peabody misappropriated cash from Defendant for his personal use.  Plaintiff complained to Peabody and told him that his misappropriation made it difficult to maintain accurate financial records.  According to Plaintiff, Peabody told her not to worry about the overall finances and that he would handle any financial discrepancies.

In December 2007, Plaintiff discovered she was pregnant.  According to Plaintiff, initially, Peabody seemed fine about her pregnancy and "[e]verything was great." (Plaintiff's deposition at 21:18-19).  Peabody did make comments about Plaintiff's pregnancy that hurt Plaintiff's feelings, such as comments about the size of Plaintiff's belly, that Peabody's baby could kick her baby's "ass," and that pregnant women were unattractive, however, Plaintiff acknowledged that Peabody's comments were informal and less respectful because they were family.  *Id.* at 57:3.

During Plaintiff's seventh or eighth month in her pregnancy, she informed Peabody that she would need two to three months off from work for the birth of her baby.  They discussed the fact that Plaintiff would have to have a C-section, and Peabody informed her that three months of leave would be fine.  Peabody also offered to pay Plaintiff her salary during her leave, because she was his sister.

According to Plaintiff, prior to her taking leave, Peabody's demeanor towards her was not the same. Although Plaintiff did not have specific examples of this change in demeanor, Plaintiff stated that Peabody would have "blow up moments" where he would get angry and act disrespectful. *Id.* at 51:21-25. According to Plaintiff, Peabody did have blow up moments with other employees.

According to Plaintiff, in July 2008, she met with Peabody and discussed Defendant's finances, specifically a notice from the Florida Department of Revenue assessing a potential penalty against Defendant regarding the June 2008 estimated tax for sales and use. Peabody told her that he would handle the potential penalty because she was getting ready to take her leave. Plaintiff stated that in late July 2008, or early August 2008, she and Peabody again met to discuss Defendant's finances. At that meeting, Peabody told her not to worry about any deficiencies with Quick Books because he did not rely on Quick Books to review the company's finances. According to Plaintiff, Peabody assured her that her work was fine and that he would handle any issues.

Plaintiff began her leave on August 5, 2008, and on August 11, 2008, she gave birth to her son. On August 18, 2008, Peabody called Plaintiff and terminated her employment. According to Plaintiff, Peabody stated that he had to let her go and she immediately started crying and told him that if her termination had to do with her leave, she would return to work early. According to Plaintiff, Peabody said that he could not allow Plaintiff to return to work early because she would be a liability. Plaintiff said that the liability comment had to do with

the fact that she was pregnant and had a C-section.   Peabody did not mention her performance during the call or the financial state of the company.

Peabody admitted that he told Plaintiff she would be a liability because he could not trust her any longer in the company.  According to Peabody, Plaintiff was terminated because he discovered that Plaintiff was not fulfilling her responsibilities and he lost trust in her. Specifically, after Peabody was informed by his accountant that Plaintiff failed to pay the sales taxes on time, Peabody called Wilson and requested she return to review Defendant's books and finances.  Wilson then analyzed the financial books and informed Peabody that the bank accounts were out of balance and had not been reconciled, checks written and cashed were not inputted into Quick Books, vendor bills had not been entered into Quick Books, credit card deposits and fees had not been reconciled, and long term vendor accounts had not been paid.  Wilson told Peabody that the state of affairs reminded her very strongly of the first time she looked at the books in December, 2003, right before Defendant had to file for bankruptcy.

Peabody stated during his deposition that he did not tell Plaintiff her work performance was the reason for her termination and that there is no writing that exists, prior to the filing of this lawsuit, that would show that he believed Plaintiff was doing a bad job during her employment at Defendant.

According to Solange Botbol ("Botbol"), Peabody and Plaintiff's sister, Plaintiff called her crying after Peabody terminated her and told Botbol that Peabody said she would be a liability if she returned to work early.  Botbol then spoke to Peabody, who told her that

he could not have Plaintiff return to work because she would be a liability.  Peabody never

referenced Plaintiff's performance or the financial state of the company as the reason for

Plaintiff's termination.

On August 22, 2008, Peabody wrote Plaintiff the following e-mail, which is stated in

relevant part:

> I don't know where to begin but by saying I'm sorry.  This has been the most
> difficult thing to do in my life and it is impossible not to feel some of the pain
> that you must be experiencing because of the actions that I have taken.  It was
> not easy for me to do and it certainly is not and will not be easy for you to
> accept either.  For that, I am deeply and truly sorry.
>
> My intentions where [sic] not to injure my little sister but to get her to
> understand that the only reason I did it, was to prevent from going into another
> bankruptcy.  We are somehow able to right now, manage all the
> responsibilities that you had and we are doing it by working harder and longer
> hours.  Everyone has stepped up to the plate and have [sic] sacrificed one way
> or another in order to maintain a lower payroll cost going into an uncertain
> future.
>
> The cuts were made because our payroll had risen $180,000 OVER what it
> should be based on our current revenue.  This is unsustainable and the end was
> either very near, or I had to do what I did.  If you had been or were in my
> shoes Michu (Plaintiff), you would have had to do the same in order to
> maintain the lives of the many at the sacrifice of the few.
>
> You have certainly not been sacrificed.  For you are my little sister and always
> will be.  No matter what happens, I will always extend my home to you and
> my love to you and prevent you and your baby from ever suffering without the
> basics in life.  At this time however, I cannot afford to financially support you
> in any way.  I must focus on the survival of the company and try to maintain
> it's [sic] vitality in the face of troubled times for everyone.

(Dkt. 32, Ex. B thereto).  Plaintiff did not respond to Peabody's e-mail.

Peabody again wrote Plaintiff an e-mail in Spanish on August 28, 2008.[2]  The e-mail stated:

> I have been thinking of things that have happened, and you're not alone in feeling this pain and sentiment.  I feel sad of what we've come to.  It hurts me in my heart that you are sad and confused over the situation.  I want you to know that we're all suffering, and I want to help you as soon as business does better and things aren't so critical.  Right now the business is still negative.  You know, I've had to give a lot of money.  I had to put in a lot of money during the bad times, and the business is still in the same situation.  It's going to take time for things to get better, and I'm scared that I won't survive it.  We will see how we will do the next four months to see if I need to make any other changes.  During this time I want you to know that I love you and that I miss you in my life.  I don't wish you any harm, and I want you to be happy.  Asking you for your forgiveness again.  Love, Bryan (Peabody).

(Plaintiff's deposition at 93-94, Ex. 7 thereto).  Plaintiff did not respond to this e-mail.

On October 2, 2008, Plaintiff filed her Charge of Discrimination with the EEOC.  In response, on February 2, 2009, Defendant submitted its Position Statement.  In the Position Statement, Defendant stated that Plaintiff's job performance was the reason for her termination.  Defendant also stated that Plaintiff's mistakes had resulted in financial problems.

According to Plaintiff, during her employment at Defendant, Peabody never disciplined her or told her that she was performing poorly.  According to Peabody, he did discipline Plaintiff for poor performance during her employment, however, he always disciplined her verbally, and not in writing, because he did not want to embarrass her.

---

[2] Plaintiff translated the e-mail during her deposition.

Plaintiff sued Defendant alleging pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("CRA 1991) and The Florida Civil Rights Act of 1992 ("FCRA") and violation of the Family and Medical Leave Act ("FMLA").

Defendant has now filed a motion for summary judgment and Plaintiff filed a response in opposition.  Defendant then filed a motion to strike portions of Plaintiff's affidavit and exhibits filed with her response in opposition.  Defendant claims that portions of Plaintiff's affidavit amount to a "sham" and should be stricken.  In addition, Defendant argues that some of the exhibits relied upon in Plaintiff's response should be stricken because Plaintiff failed to authenticate them.

## DISCUSSION

## I.      Defendant's Motion to Strike

As an initial matter, the Court will discuss Defendant's motion to strike because it relates to some of the evidence considered by the Court in its ruling herein.

Although summary judgment may be granted only if the record reflects that no genuine issue of material fact exists, (*see Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir. 1986) and Fed.R.Civ.P. 56), parties may attempt to escape summary judgment by using affidavits to create issues of fact where none exist.  Under such circumstances, a court may disregard an affidavit as a "sham" if the affidavit *flatly contradicts* earlier deposition testimony in a manner that cannot be explained.  *Van T. Junkins and Assoc. v. U.S. Indus.,* 736 F.2d 656, 657 (11th Cir. 1984).  Under this approach, "[w]hen a party has given clear

answers to *unambiguous* questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.*

Thus, an affidavit is properly considered a sham if "the affiant (1) makes a conclusory, unexplained assertion regarding a material fact which (2) directly contradicts that person's unequivocal deposition testimony." *Tippens*, 815 F.2d at 68 (Hill, J., dissenting). Even so, the Court should only disregard affidavits in limited circumstances: "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens,* 805 F.2d at 954 (internal quotation marks omitted). Care must be taken to distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953. "In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." *Id.*

Defendant first argues that the Court should strike certain portions of Plaintiff's affidavit because they are inconsistent with Plaintiff's deposition testimony. Plaintiff argues in opposition that her affidavit is not inconsistent with her deposition and either expands on issues that were discussed during her deposition, or covers issues that were not discussed at all. The Court agrees.

Upon review of Plaintiff's deposition and affidavit, the Court concludes that Plaintiff's affidavit is not inconsistent with her deposition testimony. Regarding Plaintiff's responsibilities and Peabody's financial management of Defendant, her affidavit merely

discusses her job description in more detail.  Reading Plaintiff's deposition as a whole, as opposed to reading the limited portions Defendant cites to in its motion, demonstrates that Plaintiff's affidavit is not inconsistent regarding these issues.

As to the portions of Plaintiff's affidavit discussing Peabody's misappropriation of Defendant's cash for his personal use, although Plaintiff was asked during her deposition about times when Peabody was untruthful and lied on documents, Plaintiff was never asked about any issues related to the misappropriation of money.  This topic simply did not come up and Plaintiff did not volunteer this alleged information when she was discussing Peabody's untruthfulness.  Any failure to volunteer that information would become an issue of credibility and would not render that portion of her affidavit a clear sham.

Turning to the portions in Plaintiff's affidavit which seem to refute Defendant's position on her termination, the Court concludes that Defendant's question during Plaintiff's deposition about reasons for Plaintiff's termination was not clear.  Specifically, Defendant asked the following during Plaintiff's deposition:

> Q.    Okay.  Are you aware of what the company's position is related to why you were terminated?
> A.    No.
> Q.    You've read the e-mail from Bryan (Peabody) about the financial condition of the company, correct?
> A.    Yes.
> Q.    So, basically, the company's position is that you were terminated because you didn't properly perform your job?
> A.    Right.
> Q.    And this placed the company in a serious financial deficit?
> A.    Right.

> Q.     *With that in mind, do you have any facts which would support the belief or your opinion that their reason for your termination is not truthful or is a lie?*
> MR. FRALEY:     Object to form.
> THE WITNESS:     I have no idea.  The only thing I know is what he said to me that morning.  That's all I know.
> BY MS. GRIFFIN:
> Q.     And he said that if you came back to work early you would be a liability for the company?
> A.     Correct.

(Plaintiff's deposition at 118-19) (emphasis added).  The italicized question is ambiguous, because it is unclear whether Plaintiff is being asked to state her overall opinion as to why she was terminated or her belief that Defendant's reason for her termination was not truthful. It is also unclear whether the question relates to the previous questions regarding Plaintiff's alleged performance problems and Defendant's alleged financial deficit.  It is possible that Plaintiff interpreted the question as asking her to state her opinion on why she thought Peabody terminated her, as opposed to explaining how Defendant's termination reason was untruthful, because Plaintiff referenced Peabody's "liability" comment, which was stated during their telephone conversation on August 18, 2008.  This response is not inconsistent with Plaintiff's overall position regarding the real reason for her termination as set forth in her deposition and affidavit.  Moreover, Plaintiff testified during her deposition that Peabody never talked to her about things he would like her to do differently in her job.  Plaintiff also testified during her deposition that Peabody did not talk to her about things that were wrong with her position or performance, which is consistent with her affidavit to the extent that she denies Defendant's reason for her termination.

Finally, the portions of Plaintiff's affidavit related to the meetings in July and August of 2008 where she and Peabody allegedly discussed Defendant's financial state, that the finances were not in order, and that the delay in payment of the June 2008 sales and use tax payment could result in penalties are not inconsistent with her deposition because these meetings and the June 2008 sales and use tax payment were never discussed during her deposition.

Simply put, the majority of the alleged discrepancies in Plaintiff's affidavit were not clearly discussed during her deposition and would turn on Plaintiff's credibility, rather than on whether the affidavit was a transparent sham. And the Court cannot decide issues of credibility. Accordingly, Defendant's motion to strike portions of Plaintiff's affidavit must be denied.

As to the remainder of Defendant's motion to strike, which relates to the admissibility of certain exhibits and whether Musette Fernandez's affidavit should be stricken because she was not properly disclosed, this evidence was not relied upon by the Court to conclude that genuine issues of fact prevent summary judgment in Defendant's favor. Thus, Defendant's motion to strike is denied as moot as to these remaining issues.

## II.   Defendant's Motion for Summary Judgment

### A.   Standard of Review - Motions for Summary Judgment

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson*,  477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).   However, there must exist a

conflict in substantial evidence to pose a jury question.  *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

**B.**     **Defendant's Argument that Plaintiff Cannot Establish that Defendant Violated the FMLA As A Matter of Law**

Defendant argues that Plaintiff cannot establish that her termination while she was on maternity leave violated the FMLA as a matter of law.

The FMLA entitles an eligible employee to take twelve workweeks of leave during any twelve-month period because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.   29 U.S.C. § 2612(a)(1)(D).  In addition to taking twelve weeks of leave at once, an employee may take intermittent leave in separate blocks of time because of a single qualifying medical reason. 29 C.F.R. § 825.202(a).

To preserve these rights to take leave, the FMLA creates two types of claims: interference claims, in which an employee alleges that her employer denied her a benefit guaranteed under the Act, 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that her employer discriminated against her because she engaged in activity protected by the Act. 29 U.S.C. § 2615(a)(2).

Retaliation and interference claims have different standards of proof.  To state an interference claim, a plaintiff must demonstrate that she was entitled to a benefit under the FMLA and the employer denied her the benefit.  *Strickland v. Water Works & Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206-07 (11th Cir. 2006).  The employer's motives

are irrelevant.  *Id.* at 1208.  In contrast, to succeed on a retaliation claim a plaintiff must show that the employer acted with discriminatory or retaliatory animus when the plaintiff was discharged.  *Id.* at 1207.

The Court concludes that material disputed facts preclude entry of summary judgment in Defendant's favor on Plaintiff's FMLA claims.  Turning to the interference claim, Defendant is correct that the right to reinstatement is not absolute and can be denied by an employer in appropriate circumstances, i.e., if the employer can demonstrate that it would have discharged the employee had she not been on FMLA leave.  *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236 (11th Cir. 2010).  Here, however, there are facts calling into question Defendant's independent reason for Plaintiff's termination.  Defendant claims that Plaintiff was terminated based on her performance and that her performance issues were not discovered until she went on leave.  But there are facts in the record suggesting that Peabody was aware of the state of the finances and told Plaintiff not to worry about the finances being out of date.  The record also reflects that Peabody never told Plaintiff she was being terminated because of her poor performance and provided inconsistent reasons for Plaintiff's termination throughout the litigation.  For example, Peabody's August 22, 2008 e-mail to Plaintiff does not reference Plaintiff's performance and could be read to suggest that Plaintiff's termination was a payroll issue.  Peabody's August 28, 2008 e-mail to Plaintiff also does not reference Plaintiff's performance.

Finally, a finder of fact could interpret Peabody's "liability" comment, which was stated during the August 18, 2008 call from Peabody to Plaintiff terminating her

employment, as directly relating to Plaintiff's FMLA leave and pregnancy.  According to Plaintiff, Peabody directly referenced her pregnancy and C-section as being a "liability" when she asked him if her leave was the reason for her termination and volunteered to return to work early.

For these same reasons, the Court cannot enter summary judgment in Defendant's favor on Plaintiff's retaliation claim.   In the absence of direct evidence of discrimination by the employer, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applied in evaluating FMLA retaliation claims.  To state a claim of retaliation, an employee must first establish a prima facie case of retaliatory discharge.   An employee must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action. *Strickland,* 239 F.3d at 1207.  Once an employee establishes a prima facie case, the burden of production shifts to the employer "to articulate a legitimate reason for the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1296, 1297 (11th Cir. 2006).

If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* at 1298 (*quoting Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000)).  To show pretext, the employee may rely on evidence that he already

produced to establish his prima facie case.  *Martin v. Brevard County Pub. Schools,* 543 F.3d 1261, 1268 (11th Cir. 2008).

It is undisputed that Plaintiff engaged in statutorily protected activity (Plaintiff took FMLA leave on August 5, 2008) and that Plaintiff suffered an adverse employment action (her termination).  And the Court concludes that there is sufficient circumstantial evidence of a causal connection between the protected conduct and the adverse employment action. Although Peabody's "liability" comment is not direct evidence of causation, it is sufficient circumstantial evidence of causation if the evidence is construed in a light most favorable to Plaintiff, the non-movant.  Also, the closeness in proximity between Plaintiff's taking leave on August 5, 2008 and her termination, which occurred less than two weeks later is also sufficient circumstantial evidence of causation.   A finder of fact could conclude that Defendant terminated Plaintiff for exercising her rights under the FMLA.

And, as discussed herein, there are material disputed facts on the issue of Defendant's nondiscriminatory reason, i.e., that Plaintiff was not satisfactorily performing her responsibilities, sufficient to establish pretext at this stage.   Importantly, within the *McDonnell Douglas* burden-shifting analysis, a plaintiff may show pretext when she is able to demonstrate "such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's proffered reasons that "a reasonable factfinder could find them unworthy of credence."  *Jackson v. State of Ala. State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir. 2005).

Here, Plaintiff has established inconsistencies or contradictions in Defendant's proffered reasons such that a reasonable fact finder could find them unworthy of credence. Specifically, Plaintiff has established that Defendant has advanced different and potentially conflicting reasons for its actions at various stages of the process. *Cleveland v. Home Shopping Network,* 369 F.3d 1189, 1194-95 (11th Cir. 2004); *Brettner v. Colonial Pipeline Co.,* No. 1:06-CV-0764-TWT, 2007 WL 2071539, at *9 (N.D. Ga. July 17, 2007) ("The Court concludes that the Defendant's differing and sometimes contradictory reasons for this firing indicate a degree of untruthfulness that, when viewed in the light most favorable to the Plaintiff, demonstrate a genuine issue of pretext."). There is also evidence that Defendant's nondiscriminatory reason is untruthful because Peabody was aware of the company's financial state before Plaintiff went on leave and told Plaintiff to not worry about paying the June 2008 estimated tax and updating the financial records.

Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim must be denied.

### C.    Defendant's Argument that Plaintiff Cannot Establish that Defendant Terminated Her Because of Her Pregnancy As A Matter of Law

Pursuant to Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The Pregnancy Discrimination Act ("PDA") amended Title VII by providing that the prohibition

against employment-related discrimination "on the basis of sex" includes discrimination based on pregnancy, childbirth, or related medical conditions. *Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312-13 (11th Cir. 1994).

The analysis applied to pregnancy discrimination cases is the same analysis applied in other Title VII sex discrimination cases. *Armstrong,* 33 F.3d at 1312-13.  It is well settled that there are two types of discrimination actionable under Title VII: disparate treatment and disparate impact. *Id.* at 1313.  Disparate treatment was defined by the Supreme Court as occurring when:

> The employer simply treats some people less favorable than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (citations omitted).

The second type of Title VII discrimination, disparate impact, involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 335., 97 S.Ct. 1843.  In this case, Plaintiff asserts that she was discriminated against due to her pregnancy, and she does not allege that a facially neutral policy had a disparate impact on her as a pregnant person.  Thus, this is a disparate treatment case.

A prima facie case of pregnancy discrimination in disparate treatment cases is established when a plaintiff can show that she "(1) was a member of a protected class, (2) was qualified for the job she held, (3) suffered an adverse employment action, and (4) suffered from a differential application of work or disciplinary rules." *Sampath v. Immucor, Inc.,* 271 Fed.Appx. 955, 960 n. 5 (11th Cir. 2008). Plaintiff may employ one of three means to establish her prima facie case of disparate treatment employment discrimination under Title VII as amended by the PDA: (1) direct evidence of discriminatory intent, (2) statistical analysis evidencing a pattern of discrimination, or (3) circumstantial evidence meeting the test established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989).

Direct evidence is "evidence from which a reasonable trier of fact could find, more probably than not, a casual link between an adverse employment action and a protected personal characteristic." *Wright v. Southland Corp.,* 187 F.3d 1287, 1293 (11th Cir. 1999). The Eleventh Circuit has noted, "[o]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (quotations omitted). Further, if the evidence suggests, but does not prove, discriminatory motive, it is circumstantial evidence rather than direct evidence. *Burrell v. Board of Tr.,* 125 F.3d 1390, 1393 (11th Cir. 1997).

Plaintiff argues that she has offered direct evidence of discriminatory intent, presumably, Peabody's liability comment.  However, the Court concludes that the comment could be interpreted as not being discriminatory based on Peabody's explanation that he meant Plaintiff was a liability because of her performance issues and the fact that he could no longer trust her working for Defendant.

In analyzing allegations supported by circumstantial evidence under Title VII, the Court follows the burden-shifting analysis established in *McDonnell Douglas* and its progeny, which has been set forth herein.  As an initial point, Defendant argues that Plaintiff cannot establish a prima facie case because she was not qualified for her position.  The Court disagrees.  Plaintiff is qualified for the position because she held the position for about six years.  *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354 (11th Cir. 1999); *Pace v. Southern Railway Sys.,* 701 F.2d 1383, 1386 n. 7 (11th Cir. 1983) (finding that "where a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred").  And even if Plaintiff was not qualified by virtue of holding the position for such a length of time, there is a disputed issue of material fact related to whether there were problems with Plaintiff's performance.

The Court also concludes that there is sufficient evidence, interpreted in a light most favorable to Plaintiff, the non-movant, to create a material disputed fact on the issue of whether Plaintiff suffered from a differential application of work or disciplinary rules.  Plaintiff was terminated a few weeks into her pregnancy-related FMLA leave and replaced by a male employee who had no financial background.  Moreover, there is evidence

suggesting that Defendant did not have any written work or disciplinary rules in place at the time Plaintiff was fired that applied to Plaintiff and Peabody admitted that he did not follow Defendant's employee handbook and/or disciplinary procedures for employees like Plaintiff.

Defendant next argues that it has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination which Plaintiff cannot establish was a pretext for discrimination. Defendant's legitimate, nondiscriminatory reason and the issue of pretext have already been discussed in detail in the context of Plaintiff's FMLA claims.  And for the same reasons cited therein, the Court concludes that there are sufficient facts in the record suggesting pretext at this stage.  Accordingly, Defendant's motion for summary judgment on Plaintiff's pregnancy discrimination claim must be denied.

It is therefore ORDERED AND ADJUDGED that:

1.      Defendant's Motion to Strike (Dkt. 35) is hereby DENIED.

2.      Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. 19) is hereby DENIED.

**DONE** and **ORDERED** in Tampa, Florida on September 20, 2010.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2009\09-cv-1756.msj.frm